**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| JONATHAN SMITH, derivatively on behalf of KRISPY KREME, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>JOSHUA CHARLESWORTH, MARISSA ANDRADA, DAVID BELL, PATRICIA CAPEL, DAVID DENO, OLIVIER GOUDET, PATRICK GRISMER, BERNARDO HEES, PAUL MICHAELS, GERHARD PLEUHS, DEBBIE ROBERTS, EASWARAN SUNDARAM, PHILIP TELFER, MICHELLE WEESE, and JEREMIAH ASHUKIAN,<br><br>Defendants,<br><br>-and-<br><br>KRISPY KREME, INC.,<br><br>Nominal Defendant. | Case No.<br><br>JURY TRIAL DEMANDED |

**<u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Jonathan Smith ("Plaintiff"), derivatively on behalf of Krispy Kreme, Inc. ("Krispy Kreme" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *In re Krispy Kreme Securities Litigation*, Case No. 3:25-cv-00332-MOC (W.D.N.C.) (the "Securities Class Action"); (iii)

corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of Krispy Kreme, on behalf of the Company against the Defendants, as defined herein. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least March 26, 2024 to May 7, 2025 (the "Relevant Time Period"). During that time the Defendants caused or allowed Krispy Kreme to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2. In 2016, Krispy Kreme began a move from selling its donuts solely at its own stores to selling its donuts to grocery stores, convenience stores and other retailers. In 2022, the Company entered into a partnership with McDonald's Inc. ("McDonald's") to sell donuts in McDonald's locations in the Louisville, Kentucky area. The partnership expanded in 2023, and any further expansion was described to investors as dependent on the Company's ability to make it profitable. On March 26, 2024, Krispy Kreme and McDonald's announced that the partnership would be nationwide starting in October 2024. The Company promised investors that this partnership would unlock massive growth, adding more than $400 million in annual revenue.

3. Throughout the Relevant Time Period, the Company touted its ability to meet demand for fresh donuts, and the overall success of the partnership. The Company told investors that its existing infrastructure could support expanding sales to 6,000 McDonald's locations, and only modest investments were needed to expand to the remaining 6,000 locations. The Company claimed that it was "doing a great job and making sure [the donuts] get [there] at the right time,

the right quantities," and that the donuts being sold were "well presented and always the freshest and highest quality."

4. These statements were not true. Krispy Kreme did not, in fact, have the proper infrastructure to deliver the necessary amount and necessary quality of products to McDonald's locations on a daily basis. The deficient infrastructure at the commencement of the nationwide partnership with McDonald's meant more drivers, more equipment, and renovated facilities that increased costs and decreased quality.

5. On May 8, 2025, mere months after the nationwide partnership began, the Company announced that it had stopped the McDonald's expansion. That day, the Company released its quarterly financial results, disclosing a 62% decline in adjusted EBITDA for the U.S. segment and cancelling its quarterly dividend. On this news, Krispy Kreme's stock fell 37% over the next two days from $4.33 to just $2.73, itself a drop of 84% from a high of $17.35 after the McDonald's partnership was announced.

6. On June 24, 2025, Krispy Kreme announced that it was cancelling the McDonald's partnership.

7. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

8. Plaintiff Jonathan Smith is a current shareholder of Krispy Kreme and has continuously held Krispy Kreme stock during all times relevant hereto and is committed to

retaining Krispy Kreme shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of Krispy Kreme and its shareholders in enforcing its rights.

**B. Nominal Defendant**

9. Nominal Defendant Krispy Kreme is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 2116 Hawkins Street, Suite 101, Charlotte, North Carolina 28203. Krispy Kreme common stock trades on the NASDAQ Global Select Market under the ticker symbol "DNUT."

**C. Individual Defendants**

10. Defendant Joshua Charlesworth has served as President, CEO and a director of the Company since 2024. Defendant Charlesworth has served as an executive officer of the Company since 2017.

11. Defendant Marissa Andrada served as a director of the Company from 2022 until June 10, 2026.

12. Defendant David Bell served as a director of the Company from 2016 until June 17, 2025.

13. Defendant Patricia Capel has been a director of the Company since 2024.

14. Defendant David Deno has been a director of the Company since 2016.

15. Defendant Olivier Goudet served as a director of the Company from 2016 until June 17, 2025.

16. Defendant Patrick Grismer has been a director of the Company since 2025.

17. Defendant Bernardo Hees has been a director of the Company since 2025.

18. Defendant Paul Michaels served as a director of the Company from 2017 until June 17, 2025.

19. Defendant Gerhard Pleuhs served as a director of the Company from 2022 until June 10, 2026.

20. Defendant Debbie Roberts served as a director of the Company from 2021 until June 17, 2025.

21. Defendant Easwaran Sundaram has been a director of the Company since 2025.

22. Defendant Philip Telfer served as a director of the Company from 2022 until June 17, 2025.

23. Defendant Michelle Weese served as a director of the Company from 2020 until June 17, 2025.

24. Defendants Charlesworth, Andrada, Bell, Capel, Deno, Goudet, Grismer, Hees, Michaels, Pleuhs, Roberts, Sundaram, Telfer, and Weese are herein referred to as "Director Defendants."

25. Defendant Jeremiah Ashukian served as Krispy Kreme's Chief Financial Officer from January 2023 to July 11, 2025.

26. Defendants Charlesworth and Ashukian are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

28. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

30. Venue is proper in this court under 28 U.S.C. § 1391, because Krispy Kreme is incorporated in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Company Background

31. Krispy Kreme has been selling donuts since 1937 and is well known for its signature Original Glazed donut. The Company was taken private by JAB Holdings ("JAB") in 2016 and relisted in 2021. Currently, JAB owns 43% of Krispy Kreme's outstanding common stock.

32. The Company has three reported segments: U.S., International, and Market Development. The U.S. segment constituted 65% of the Company's total revenues in fiscal year 2023 revenue and 64% of total revenues in fiscal year 2024.

33. Before its acquisition by JAB, Krispy Kreme baked and sold their donuts at Krispy Kreme stores. In 2016, the Company moved to a "hub and spoke" distribution model where "hubs" produced the donuts, which were then sold through "spokes" that included the Company's own stores and partner retailers such as grocery stores, convenience stores, and quick service or fast casual restaurants.

34. Even with the new business strategy, the Company was struggling. A former Senior Director of Outsourcing for International Business, who was employed at Krispy Kreme between March 2022 and January 2025[1], explained that "the financial reporting was coming out and they needed something."

35. On October 18, 2022, the Company announced a "small operations test" in which Krispy Kreme doughnuts would be "delivered fresh daily" to nine McDonald's locations in the Louisville, Kentucky area. A few months later, on February 27, 2023, the companies announced that the test program would expand to 160 McDonald's locations around the Louisville-Lexington, Kentucky area. The expansion was intended to evaluate consumer demand and the Company's ability to distribute fresh donuts on a large scale.

36. FE 2[2], a former Vice President of Investor Relations, stated that the expansion was pushed because Krispy Kreme's business had been contracting, and Defendants were scrambling for a way to show that they could somehow reverse the negative trajectory. A former Senior Field Training Manager[3] who was a part of the McDonald's rollout team, claimed that the Company needed to improve sales because in 2024, "people weren't spending and our in-store sales were not the best."

---

[1] Certain witness testimonies cited herein are drawn from pleadings in the Securities Class Action. Confidential witnesses are referred to herein as "CW_." Former Krispy Kreme employees are referred to herein as "FE __." All FEs will be referred to as "they/them." FE 1's employment ended in January 2025 as part of "massive layoffs after the McDonald's deal fell through."

[2] FE 2 was in this role from August 2023 through March 2024 and worked on the March 26, 2024, press release announcing the McDonald's expansion. They reported to Defendant Ashukian.

[3] FE 3 was a Senior Manager Field Training in the U.S. and worked at Krispy Kreme from February 2021 through March 2025. They were part of the McDonald's partnership as of the summer of 2023. They reported to the Vice President of Human Resources, James Dunworth, and attended meetings with Amy Hine, the Director of Field Operations.

37. The ultimate goal was to get "doughnuts to where customers are." Having Krispy Kreme donuts available in more locations would ostensibly lead to increased sales. However, this was dependent on the Company's ability to actually get donuts to those locations and in edible condition. The Company assured investors that any expansion of the test program nationwide would occur only if the Company was able to handle the logistics in a way that did not impact profitability. For example, during a Morgan Stanley Global Consumer & Retail Conference held on December 5, 2023, Defendant Charlesworth emphasized that Krispy Kreme had conducted "a lot of detailed work" on the potential McDonald's expansion and concluded that the associated expenses would remain modest. In fact, Charlesworth stated that the Company could service "just under half" of McDonald's locations—approximately 6,000 new doors—using its "existing capacity" and requiring little more than "just [] trucks and drivers."

38. On March 26, 2024, the Company announced a partnership with McDonald's wherein Krispy Kreme donuts would be sold at McDonald's locations nationwide. Throughout the Relevant Time Period, the Company repeatedly communicated to investors that the expansion was proceeding according to plan, that the costs were not prohibitive, and that the expansion was, overall, a great success. Unbeknownst to investors, the McDonald's partnership was doomed from the start. The Defendants had not adequately researched the viability of the nationwide expansion, had not adequately prepared its infrastructure and facilities for the expansion, and ignored just how costly it would be to actually undertake the expansion.

39. 15 CW 10 was a Kitchen Manager at McDonald's during the rollout. She reported to the store's General Manager, and had constant interaction with the franchisee, who owned twenty McDonald's locations in the Chicago area.

**B. Inadequate Research Into the Expansion's Viability**

40. The McDonald's partnership was green-lighted despite a lack of due diligence into the Company's ability to perform and the profitability of the partnership. For example, according to FE 1, internally at Krispy Kreme it was widely known that the "deal would not last because the due diligence was not properly done." FE 4[4], a former Krispy Kreme Senior Director in the McDonald's Business Unit, explained that the Company's rush to expand the McDonald's partnership nationwide led to fatal flaws because there was no one advising Krispy Kreme about what a McDonald's buildout actually entailed, what McDonald's expected from its suppliers, how McDonald's franchisees ordered and managed their inventory, or how McDonald's would advertise non-McDonald's products.

41. The nationwide expansion came after test programs in Kentucky that the Company claimed proved that demand "exceeded expectations" and would allow for "profitable US expansion." In reality, the Company did not have the data to support these claims. In fact, the test programs themselves were structured in such a way that they could not determine scalability or profitability. According to FE 3, McDonald's primary goal during the test program was to ensure zero waste, not assessing demand. FE 3 went on a seven-hour delivery ride-along in Lexington, Kentucky during the test program, during which the driver delivered to only eight McDonald's locations and supplied less than 200 total donuts because that "was all McDonald's ordered." McDonald's managers interviewed by FE 3 said that the donuts would sell out, but that McDonald's refused to increase the orders in order to avoid waste. McDonald's would cut orders if sales dipped even slightly; increased sales did not lead to increased supply because McDonald's

[4] FE 4 was hired by Krispy Kreme in November 2024 because they had a long history of working with McDonald's suppliers. They were employed at Krispy Kreme from November 2024 to June 2025. FE 4 claimed that they were hired to manage the McDonald's partnership.

did not want to get stuck with large numbers of unsellable donuts. As FE 3 explained, the test program never looked at whether higher volumes of donuts would sell because the locations were stocked with minimal quantities. The test program did not actually measure demand.

42. According to FE 3, this was not a secret to Krispy Kreme, which was spending "all this money but only delivering a couple of trays of doughnuts." As FE 3 stated: "do the math, 200 doughnuts is not going to pay for a driver at $18.00 an hour." FE 9[5], who served as an Executive Vice President and Chief Global Supply Chain Officer, stated that the results of the Kentucky test program did not show a "justification" for a larger expansion. They claimed that management ignored the fact that McDonald's cut orders "almost from day one."

43. McDonald's behavior was not confined to the Kentucky test program. According to FE 4, Krispy Kreme and McDonald's used a third-party consultant to determine the number of donuts to deliver to McDonald's locations upon launch, which was "locked" for the first few weeks. After that, McDonald's could order more or less donuts as it saw fit. FE 4 recalled that donut orders plummeted after the lock-up period expired, just as what happened in Kentucky. This was confirmed by other former employees, including FE 3, and FE 7[6], a Krispy Kreme General Manager in the Grand Rapids, Michigan area from June 2018 through August 2025, and FE 8, a Customer Logistic Manager in a Chicago-area Krispy Kreme from May 2024 to October 2025. FE 11, an Implementation Consultant who worked on the McDonald's partnership from June 2024 through June 2025, stated that the drop in McDonald's ordering occurred with every launch, and

---

[5] FE 9 was the Executive Vice President – Chief Global Supply Chain Officer from July 2021 to January 2025.

[6] FE 7 was directly responsible for store openings and McDonald's rollouts at numerous Company locations. FE 7 reported to Brendan Wolmak and worked personally with Amy Hine, the Director of Field Operations, on a number of occasions, including concerning store rollouts.

FE 6[7], a data analyst at Krispy Kreme, recalled that the reduction in donut orders was apparent by autumn 2024.

44. Exacerbating the issue was the lack of advertising support from McDonald's. The partnership with McDonald's did not include consistent advertising paid for by McDonald's. Despite this, according to FE 4, Krispy Kreme used the very top range of all possible projections to support the expansion, which included consistent advertising paid for by McDonald's. The Company did not know that suppliers do not have the ability to influence McDonald's advertising products, because according to FE 4, the Company failed to speak with anyone who had experience with McDonald's before rolling out the nationwide expansion.

### C. Turning a Blind Eye to the Significant Costs of the Partnership

45. The Company repeatedly claimed that the nationwide expansion could be accomplished with its existing infrastructure, and that the rollout was "on track." The truth was that Krispy Kreme's operations could not be scaled to service hundreds, let alone thousands, of new locations. For the Company to make the expansion a success, it would be prohibitively expensive. A former Implementation Consultant hired specifically to work on the nationwide expansion, FE 5[8], explained that the McDonald's partnership was supposed to save the Company, "but Krispy Kreme just wasn't ready," forcing the Company to "sign[] up for something that was unrealistic."

---

[7] FE 6 was a Data Analyst from January 2024 to July 2025 and reported to Amy Hine. FE 6's responsibilities required that they monitor employees through cameras placed inside the shops, which gave FE 6 firsthand knowledge of what was happening in the production facilities.

[8] FE 5 was an Implementation Consultant from June 2024 to May 2025. They met regularly with Amy Hine, the Director of Field Operations, and reported to Keith Katz, Senior Manager of Operations Market Implementation, both of whom oversaw the McDonald's expansion.

46. Multiple former employees claimed that the Defendants were aware that the expansion would significantly increase costs, because the Director of Field Operations, Amy Hine, presented the costs to the Defendants during the summer of 2023. The calculation of the costs for the expansion was a project called "Project Ray." FE 3 stated Amy Hine's comprehensive analysis of the expansion's cost was presented to the Board before the McDonald's partnership was announced in March 2024. Ms. Hine detailed the magnitude of the required investments, including the specific rationale underlying each component, and provided an analysis across all relevant cost categories, expressing concern about the cost parameters associated with the project. FE 3 recalled that "Amy asked the question many, many times: are you sure you want to proceed if it's going to cost this much money up front?" FE 3 further explained that, given the scale of the required investment, "there was no way that they were going to get that [money] back anytime soon."

47. FE 6 stated that these cost estimates were regularly shared with the Company's senior officers, including the Vice President of Operations, the Chief Operating Officer, and Defendant Charlesworth. According to FE 6, because Krispy Kreme was cash poor, all expenses related to the expansion needed to go to Ms. Hine, who would then get approval from the VP of Operations or Defendant Charlesworth, as "Hine had meetings with both of them."

48. The Defendants pushed the nationwide McDonald's expansion even after being warned of the prohibitive costs. According to FE 1, the mantra within the Company was "get it done, get it done, get it done." This was confirmed by FE 4, who was hired specifically to oversee the McDonald's expansion. FE 4 claimed that after they started in November 2024, they "realized that everything was already signed" and that the terms were "problematic" and highly unfavorable for Krispy Kreme. Those "problematic" terms included no minimum order requirements for McDonald's, no parameters for the number of donuts ordered by McDonald's franchisees, and no

guarantee that McDonald's would include Krispy Kreme in advertisements. Worse still, the partnership contract did not specify which party would pay for unsold donuts. According to FE 4, the contract called for a complex formula where Krispy Kreme covered some "waste," but as sales fell, McDonald's would need to cover more of the waste. McDonald's franchisees did not want to pay for unsold donuts, and without explicit language about who covered what, the contract essentially allowed the franchisees to minimize orders to avoid the issue entirely.

49. FE 3 explained that, unlike other Krispy Kreme customers, McDonald's had no minimum ordering requirements as "they could order whatever they wanted." That meant that the Company still had to deliver donuts, even if the orders did not cover costs. According to FE 3, "with the way that McDonald's could tweak their orders, we would have never made money, ever," yet "somehow in the contract with McDonald's, we allowed that to happen and that's where we got screwed." FE 4 stated that numerous assumptions underlying the partnership were flawed; for example, the initial estimate to deliver donuts was half of the actual cost.

50. Even if the partnership terms had been written to prevent Krispy Kreme from absorbing waste and delivery costs, the costs involved in preparing for and implementing the nationwide expansion were "dramatic and drastic," according to FE 1. This was confirmed by FE 5 and FE 11, who were two of the consultants tasked with implementing the McDonald's expansion. FE 5 stated, the team knew from the very beginning that Krispy Kreme "had bitten off more than they could ever chew" with McDonald's. FE 7, a former General Manager for Krispy Kreme, stated that they knew "from the beginning" that the McDonald's partnership was not going to work for the Company because of the costs involved, as "[w]hat they were asking of the stores was pretty astronomical." FE 7 further stated that the Company was "spending money left and

right, doing whatever needed to be done . . . we were over-staffing locations and spending money like crazy on labor."

51. The nature of the McDonald's partnership triggered other costs, as well. The U.S. Food and Drug Administration requires food production facilities have multiple check points to ensure that hazardous material is not introduced during production. A restaurant can become a food production facility when more than half its sales are made from shipping or delivering to other parties. FE 3 stated that the McDonald's partnership turned numerous Krispy Kreme locations from a restaurant to a food production facility, which required investment in equipment to meet FDA rules regarding hazardous materials. According to FE 3, the Company had to purchase metal detectors for its U.S. facilities at immense cost. The decision to purchase metal detectors was confirmed by FE 6, FE 4, FE 5, and FE 7. These metal detectors cost between $40,000 to $65,000 per unit, not including the costs for shipping and installation. The baking facilities required between two and three detectors per site. According to FE 6, who was in charge of monitoring metal detector compliance, Krispy Kreme ordered metal detectors for approximately 120 locations, which alone cost the Company more than $18 million. FE 3 reported that after the McDonald's partnership was cancelled, those metal detectors were no longer used.

52. The nationwide partnership also meant that Krispy Kreme had to hire new drivers and purchase hundreds of additional trucks to support the expanded deliveries. The Company spent 30-50% more on supplies like flour and sugar, as well, according to FE 1.

**D. Ill-Prepared Infrastructure and Facilities**

53. Even assuming that Krispy Kreme adequately investigated the feasibility and viability of the nationwide McDonald's expansion, and adequately budgeted for the increased costs, the condition of the Company's infrastructure and facilities still would have hindered the

success of the expansion. According to FE 5, labeled Krispy Kreme's factory conditions were "disgusting": "rodents, rats, mice, roaches, and no standards of cleanliness," and production lines often full of mold. All of the implementation consultants for the expansion were in "complete shock," and flagged these issues to Ms. Hine—who reported directly to Defendant Charlesworth—and Keith Katz, the Senior Manager, Operations Market Implementation. FE 5, who prepared Krispy Kreme shops in Illinois, Ohio, New York, Indiana, Kentucky, and West Virginia for the McDonald's partnership, reported that these problems were pervasive in each shop. FE 5 reported that they begged Mr. Katz: "Keith send me to a shop that [actually] looks the way it is supposed to look so that I have something to compare these bad ones to." That never happened. FE 11, another implementation consultant, confirmed that many of the shops were older and had structural gaps that allowed rodents to enter. They stated that one of the shops that was being tested as a production facility for the McDonald's partnership had a full infestation and had to be shut down for several days for remediation.

54. FE 3, a Senior Manager, Field Training, who was responsible for implementing trainings in connection with the McDonald's expansion, confirmed that many Krispy Kreme facilities were on performance improvement plans specifically because of their poor food safety records. FE 6, who was present at multiple meetings regarding the McDonald's partnership, stated that there were often mold, rodents, or other sanitary issues in the Krispy Kreme facilities, including ones they personally visited. FE 8 stated that there were rodents in and around their shop, and generally described the condition of the store as "really bad."

55. The condition of the production facilities was critical to the success of the nationwide expansion because the contract with McDonald's required audits of the Krispy Kreme facilities to ensure they met McDonald's standards. According to FE 3, McDonald's third-party

auditor, McClement, imposed standards far higher than those employed by Krispy Kreme, which forced the Company to spend heavily "getting our shops that were identified to be McDonald's locations, up to a higher standard." This included increased safety documentation, hygiene training, sick policies, personal cleanliness, and additional headcount for cleaning. For example, FE 3 stated that McClement required Krispy Kreme to purchase numerous swabbing machines that tested for bacteria. These machines meant not only upfront costs but recurring costs for disposable swabs, which sold for more than $500 per pack. FE 6 stated that McDonald's "very rigorous audit process" required Krispy Kreme to send out teams of specialists to the shops to perform an entire "backhouse reset" to overhaul the operations in advance of an audit.

56. The production facilities' equipment itself could not perform at the level necessary to keep up with the volume expected from the nationwide expansion. Machinery was outdated, and FE 3 stated that the Company kept "putting Band-Aids on things" when machines wore down, what it called "deferred maintenance." This led to frequent breakdowns and costly fixes. According to FE 3, the Company knew that "equipment maintenance" would be costly once the expansion commenced: "When you run a machine that hard, it turns into some pretty big expenses." FE 6 stated that "there were a lot of systems issues, many were too old and not capable of handling the volume Krispy Kreme was doing." FE 6 noted that the Company had consistently "put off doing maintenance" figuring "we'll get there when we get there." FE 7 similarly stated that "[t]here was repair and maintenance that hadn't been done in a while." FE 11 claimed that there was "absolutely" a severe problem with deferred maintenance. Out of all its U.S.-based employees, only two were capable of performing major production-line repairs, creating delays of up to days before the issue could be fixed. FE 11 recalled that there were instances where shipments could not be made because critical machinery was out of service.

57. Conditions aside, the production facilities in general could not operate at the level required to meet the necessary production volume. FE 8 claimed that the Company held a hiring spree so desperate they hired whoever walked through the door and failed to adequately train them. According to FE 5, "half the time [the facilities] didn't have a doughnut maker" and the ones that did made poor quality donuts. FE 3 led employee training that was being done at "lightning speed," and the Company had to hire expensive third parties to assist in trainings. While the Company budgeted $1 million to rewrite the new-employee training programs to comply with McClement's standards, FE 3 explained that the Company exceeded that budget. When hiring was not possible, according to FE 6, the Company increased overtime pay for existing employees to handle the production.

58. The Company did not give itself enough time to prepare the facilities for the nationwide expansion. According to FE 5, the implementation consultants had only fourteen weeks to sanitize the facilities and remove mold, fix broken down machinery, and reorganize the stores to accommodate extra supplies. Some facilities needed to be fully renovated to allow for increased production.

59. The problems caused by the inadequate infrastructure and facilities were impossible to fix once the expansion commenced. Weekly calls with the expansion consultants, attended by FE 5, were flooded with complaints about disgusting facilities, insufficient infrastructure to bake the necessary amount of donuts, and poor staffing. The best way FE 5 could describe it was "it was just a complete sh*t show." These calls were also attended by Ms. Hine, who reported directly to Defendant Charlesworth, and Keith Katz, a senior operations executive. Senior Manager Katz told FE 5 the Company needed "another three or four years of preparation" to fix the problems and build the necessary infrastructure for the nationwide expansion to be successful.

60. Even if the production facilities could produce the necessary quantity of high-quality donuts, the inadequate delivery infrastructure caused its own problems. New delivery drivers would show up for work and were told to start delivering to McDonald's, but they were not trained, did not know their routes, and were not informed about how to properly handle the donuts or when the donuts should be delivered. FE 6 explained that some McDonald's locations had tight delivery windows, and if the driver missed the window the delivery would be rejected or returned. According to FE 4: "With McDonald's you have to be 100% on time with your deliveries and Krispy Kreme just wasn't there."

61. Oftentimes, newly hired drivers did not show up at all, according to FE 5, leading to missed deliveries entirely. This was not a random occurrence; according to FE 6: "We had to hire backup drivers. Krispy Kreme had to develop all these contingency plans to prepare for people not showing up." This led the Company to hire extra drivers, offer retention bonuses, and use expensive third-party logistics companies.

**E. Defendants Knew That the Partnership was in Trouble**

62. The Defendants were aware throughout the Relevant Time Period that the nationwide expansion faced severe challenges. This was not a case of some unforeseen setbacks or small complications. From the beginning, the Defendants either knew about or willfully ignored problems with the expansion while continuing to assure investors that all was proceeding as planned. After the expansion commenced, the Company had access to sales data and information about the expansion's performance. As stated by Defendant Charlesworth on November 7, 2024: "we can track the deliveries. We can track any that are unsold. And, indeed, we can see that they clearly sold throughout the day."

63. Krispy Kreme's senior management had real-time access to the Company's financial and operational data. According to FE 2: "I know that they could do it [pull the numbers] every single day, and I know from [Defendant Charlesworth's] explanation to me that it was extremely accurate." FE 2 stated that Defendant Charlesworth would "pull his phone out" and show precisely "what came in on what day and what went in and out" when meeting with investors. Defendant Charlesworth could identify, at any given time, the number of donuts in each shop, and he monitored the Company's performance "every single day."

64. The Company tracked data about McDonald's orders through handheld devices used by delivery drivers, according to FE 5, which was automatically entered into the Company's internal systems, ensuring continuous, real-time visibility into delivery volumes, returns, and sales performance. FE 1 stated that senior management and executives all had access to data about sales and deliveries from McDonald's.

65. Moreover, employees repeatedly informed executive officers and senior-level management about the operational issues in the McDonald's expansion. In November 2024, FE 4 raised concerns about quality and logistical issues to their supervisor, Scott Bacco, Krispy Kreme's Chief Commercial Officer, and detailed how the Company was not prepared for the McDonald's nationwide expansion. FE 4 also raised operational concerns to Tom Heinzmann, the VP of U.S. Operations. This prompted Defendant Charlesworth to meet with McDonald's in Columbus, Ohio. At the meeting, which FE 4 attended, McDonald's franchisees raised the exact same problems FE 4 had raised: inconsistent deliveries, unsanitary procedures, and subpar donut quality.

66. According to FE 4, by mid-March of 2025, Defendant Charlesworth directly told FE 4 that the Company was losing money on the McDonald's partnership, "in some cases we are losing 30 cents a doughnut."

**F. Krispy Kreme's False and Misleading Statements**

67. Despite all this, throughout the Relevant Time Period the Defendants told investors that demand at McDonald's "exceeded expectations," that the Company had a "successful start of the nationwide rollout," and that the expansion did not require a significant "increase in capital expenditure."

68. For example, on March 26, 2024, the Company and McDonald's issued a joint press release announcing their partnership. According to the press release, the partnership came after "a successful test at 160 McDonald's restaurants in Lexington and Louisville, Kentucky areas where consumer excitement and demand exceeded expectations."

69. On May 9, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024. As quoted in the press release, Defendant Charlesworth assured investors that "[w]e'll support much of this nationwide rollout using existing capacity, while adding distribution with other major customers as we grow." An investor presentation published that same day noted that the partnership with McDonald's was "accelerating profitable U.S. expansion."

70. The Company held a call with analysts and investors later the same day. During the call, Defendant Charlesworth stated that "[m]uch of the national rollout can happen using existing capacity." In response to a question about the logistics of delivering a high volume of donuts, Defendant Charlesworth stated: "we're focusing our attention in the U.S. on what is a very capital-

efficient model and leveraging the excess capacity of the production hubs through these off-premise DFD doors … We've got the excess capacity in the U.S."

71. Later during the same call, Defendant Charlesworth stated that "the [McDonald's] partnership is going really great so far after what was obviously a great Kentucky test and very thorough test that demonstrated that consumer demand outstripped both [McDonald's] and our expectations." Defendant Charlesworth assured those on the call that "yes, we've done the analysis and the numbers that are in the incrementality that [the Company] shared today [were] based off a very thoughtful analysis."

72. On August 8, 2024, the Company issued a press release announcing its financial results for the second quarter of 2024. Defendant Charlesworth was quoted in the press release as stating that the Company's "profitable nationwide expansion is accelerating," which "includes the nationwide rollout to McDonald's, starting this fall in the Midwest with Chicago." An investor presentation published that same day claimed that the partnership with McDonald's was "accelerating profitable U.S. expansion."

73. Later that day, the Company held a conference call with analysts and investors to discuss the released financial results. In response to a question about whether Krispy Kreme was "still on track" with the McDonald's expansion, Defendant Charlesworth stated:

> Yes, the McDonald's partnership is going very well in general. And the rollout is on track… We have a dedicated cross-functional team there to make sure the facilities and our people are ready. In fact, we're also making improvements to the production lines and even doing our best to improve productivity and up our game as we go. We're very focused on delivering a really high quality service to the McDonald's restaurants so that people get awesome fresh donuts every day at the same quality level they're expecting Krispy Kreme and other channels.

74. During the same call, Defendant Charlesworth claimed that the nationwide expansion was "leveraging an underutilized system, the additional densification of all that distribution means you get flow through to the bottom line. . ."

75. Defendant Charlesworth made similar comments during the Piper Sandler Growth Frontiers Conference, which was held on September 10, 2024. During that conference, Defendant Charlesworth spoke on how the Company was able to handle the expansion "with just our existing production facilities, a lot of them former franchisees, a few years old, heavily underutilized. So, we're able to leverage that to service the demand," with "a very clear path to support [the McDonald's] expansion."

76. 161. On November 7, 2024, Krispy Kreme reported its financial results for the quarter ended September 29, 2024 ("Q3 2024"). The Company's press release, which was filed with the SEC on Form 8-K and was signed by Defendant Ashukian, included a statement by Defendant Charlesworth, where he touted "[t]he successful start of our nationwide U.S. rollout at McDonald's which began in Chicago in October and continues next week across Ohio and Indiana."

77. On November 7, 2024, the Company published an investor presentation to accompany the financial results for the third quarter of 2024, which were also announced that day. The presentation stated that it had seen a "successful start to nationwide McDonald's rollout," which was attributed to the Company's "strong operation execution" and "positive consumer response."

78. That same day, the Company held a conference call with analysts and investors to discuss the released financial results. During the call, Defendant Charlesworth spoke on how Krispy Kreme was "doing a great job":

> … And our teams are doing a great job and making sure that they get at the right time, the right quantities and adapting to feedback as it comes. I think probably the biggest challenge has probably been more on the delivery side, making sure that we know all the best routes to all these locations. Imagine more than 400 McDonald's added in a day for us. There's bound to be small operational adjustments needed. But I think the team have really taken that to heart and taken all learning they can

> and applying it to the pending rollouts. I mean with more than 1,000 going over the next couple of weeks, obviously, this now takes us to another level, and we need to scale and hence, our commitment to get it right. There's a few start-up costs. There's a few extra people making sure that we deliver right first time. But the team will settle into it and certainly been impressed with the partnership from the restaurant operators at McDonald's.

79. Later during the call, in response to a question about the costs involved for the rollout, Defendant Ashukian stated that the costs were merely reflective of the "intentional decision to accelerate" the rollout and therefore any increased costs were simply a "pull forward versus anything unexpected":

> And maybe I'll start with the revenue kind of point and work back. But our guide of 5% to 7% organic revenue for the year, reflects our confidence in our ability to continue to grow revenue amidst choppiness in traditional retail locations, which in the guide is being offset. So we're seeing some softness in retail by the small contribution of incremental top line due to the accelerated expansion. So we feel good that we can hold the top line. The full year guide on EBITDA was updated to reflect the impact of higher logistics costs in the quarter, our intentional decision to accelerate start-up costs. So it's a pull forward versus anything unexpected and the carve-out of Insomnia, the largest impact being the logistics cost, followed by the start-up investments and then a small amount on the kind of carve-out of Insomnia. As mentioned on the call, I think it's important to note that we are committed to continuing to drive a better business. We believe we'll return to operating leverage in the fourth quarter.

80. On February 25, 2025, the Company announced its financial results for the fourth quarter and full year 2024, as well as guidance for 2025. For the fourth quarter of 2024, the Company reported net revenue of $404 million and $45.9 million in adjusted EBITDA. In addition, Krispy Kreme forecast revenues for 2025 of $1.55 billion to $1.65 billion and adjusted EBITDA of $180 million to $200 million.

81. That same day, the Company held a conference call with analysts and investors to discuss the released financial results. During that call, Defendant Charlesworth announced that the Company "remain[ed] on track to reach about 6,000 [McDonald's] restaurants by year-end."

82. Later in the call, Defendant Charlesworth responded to a question about how the nationwide expansion had performed compared to expectations by stating that the "rollout is on track":

> Andrew, we started the phased rollout of McDonald's just in October. We're already in actually 2,500 restaurants today. We're launching in New York just today. We expect to be in about 6,000 by the end of the year and 12,000 by the end of 2026. So that rollout is on track.
>
> It's important to understand as well that the phased nationwide rollout of McDonald's is part of a broader strategy to make our fresh doughnuts more accessible, as mentioned earlier, with Walmart, Target, Kroger, Costco and others.
>
> So all that being said, the feedback from McDonald's is very positive; they tell us it's working well. And we're working hard with them to maximize the opportunity, make sure that the launch goes well.

83. Later during the same call, Defendant Charlesworth reassured investors that the Company was "leverag[ing] existing capacity" and had "increased productivity" at its existing facilities:

> [F]rom an operational point of view, that as we prepare for this nationwide footprint in the US and we expand with the national partners, we're finding more and more ways to leverage our existing capacity, whether it's because we've increased productivity at our existing hubs or we're learning how to get the doughnuts out to the points of access better and better. So there is an opportunity, we think, going forward to invest a little less than we originally expected in the hubs, which means that we'll probably only build about five to seven new hubs this year in the US, which is a little less than we had previously expected, reflecting the ability to leverage that existing capacity better.

84. That same day, on February 25, 2025, Defendant Charlesworth appeared on a Yahoo! Finance news program. In response to a question about boosting investor confidence, Defendant Charlesworth stated: "as we prepare for this National roll out in the U.S. . . . we're confident for [] the long-term profitable growth." Defendant Charlesworth claimed that "the feedback from McDonald's [] has been [] positive" and that the expansion would grow to "6,000

by the end of this year, 12,000 by the end of next year." Defendant Charlesworth also described the partnership with McDonald's as "an important program for [] our growth."

85. The Company filed its Form 10-K for fiscal year 2024 with the SEC on February 27, 2025 (the "2025 10-K"). The 2025 10-K downplayed capital expenditures made by the Company as not McDonald's-specific, stating that "these capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, the agreement with McDonald's."

86. These statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that: (a) the Company could not achieve the nationwide expansion using existing logistical infrastructure and production capacity; (b) the partnership with McDonald's and the expansion would require significant up-front costs and capital expenditures; and (c) the expansion was not an operational success and the Company would not be able to expand to 6,000 McDonald's restaurants by the end of 2025.

**G. The Truth is Revealed**

87. On May 8, 2025, the Company disclosed that Krispy Kreme had not expanded to any new McDonald's location since February 25, 2025, and that the number of McDonald's locations selling donuts had actually decreased. The Company revealed that it did "not expect to launch in any additional restaurants in the second quarter of 2025," and that the expansion was paused because the partnership with McDonald's had not "achieve[d] a profitable business model."

88. The financial results for the first quarter of 2025, which were released on May 8, 2025, revealed just how disastrous the McDonald's partnership had been. The Company reported $15.9 million of adjusted EBITDA for its U.S. segment, a 62% decline as compared to the first

quarter of 2024. The decline in adjusted EBITDA was attributed to, in part, "costs associated with our U.S. nationwide expansion." In addition, the Company removed its 2025 financial guidance and announced that Krispy Kreme would no longer pay its $0.35 quarterly dividend, which the Company had been paying consistently since 2021.

89. After closing at $4.33 per share on May 7, 2025, the Company's stock fell 37% over the following two days to close at just $2.73 per share on May 9, 2025.

90. Analysts pointed out the false and misleading statements made by the Defendants prior to May 8, 2025. Truist issued a report calling management's credibility into question, stating: "We are shocked by the speed at which the story fell apart. Management provided a 'everything going as planned message' on the 4Q earnings call in early February and at several conferences YTD." Truist had lost its "high conviction in management's previously stated strategy," downgraded its rating from "buy" to "hold," and was no longer providing any price target for Krispy Kreme shares.

91. One month later, on June 24, 2025, the Company announced that the McDonald's partnership had been terminated, specifically because of the enormous costs and lack of demand. In announcing the termination of the partnership, Defendant Charlesworth admitted that the "efforts to bring our costs in line with unit demand were unsuccessful, making the partnership unsustainable."

92. On August 7, 2025, the Company released its financial results for the second quarter of 2025. According to the press release issued that day:

> "Our results for the second quarter primarily reflect the impact of unsustainable operating costs relative to unit demand in the McDonald's USA partnership, which ended July 2, 2025. We are quickly removing our costs related to the McDonald's partnership and growing fresh delivery through profitable, high-volume doors with major customers. We expect to begin recouping profitability in the third quarter."

> "Looking ahead, we have implemented a comprehensive turnaround plan aimed at unlocking our two biggest opportunities: profitable U.S. expansion and capital-light international franchise growth. This plan is designed to reduce leverage and deliver sustainable, profitable growth through refranchising, improving returns on capital, expanding margins, and driving sustainable, profitable U.S. growth," said Krispy Kreme CEO Josh Charlesworth.

93. The press release revealed that the Company had spent $54.1 million in capital expenditures, "primarily in the U.S. to support previously committed initiatives aimed at bringing doughnuts closer to our consumers through nationwide expansion." Yet the Company disclosed that it had written off at least $51 million of assets. According to the press release, "Krispy Kreme recorded long-lived asset non-cash impairment charges of $22.1 million and lease impairment and termination costs of $28.9 million," which were specifically attributable to the "termination of the Business Relationship Agreement with McDonald's USA." Notably, the $51 million was material to the Company, as it represented more than 45% of the Company's U.S. adjusted EBITDA of $112 million in all of fiscal year 2024.

94. Moreover, the end of the McDonald's partnership led to a goodwill impairment charge of $356 million. More than $270 million of this charge was tied to the U.S. segment, which lost over 40% of its goodwill value. The Company admitted the impairments were "impacted" "by the termination of the agreement with McDonald's USA."

**H. The Board was Complicit in the Misconduct**

95. The Board was kept informed of the financial condition of the Company throughout the Relevant Time Period. Indeed, according to FE 3, a comprehensive analysis of the cost of the nationwide expansion was presented to the Board before the McDonald's partnership was publicly announced. As informed as the Board was, the existence of the false and misleading statements and misconduct detailed above show that the Board was complicit in allowing the misconduct to occur.

96. Moreover, as an officer of the Company, the Officer Defendants had a duty to provide the Board with relevant information that could affect the Board's decision making. And the Officer Defendants had access to real-time data about the partnership and the expansion. For example, during the Company's November 7, 2024, conference call with analysts and investors, Defendant Ashukian stated, "we're meeting daily as we execute the rollout of McDonald's and start to expand in different cities, just to take the learnings, as [Defendant Charlesworth] kind of mentioned, and applying course correct as we go. So, we feel pretty good that we're making the right choices, trade-offs. We have an ecosystem in place where we're managing issues real time and making choices where we need to be to make sure that we're seeing the flow-through that we need to." Defendant Charlesworth also stated on that call, "we can track the deliveries. We can track any that are unsold. And, indeed, we can see that they clearly sold throughout the day."

97. Former employees also confirmed that the Officer Defendants had access to information about how well the national partnership was going. For example, FE 2 stated, "I know that they could do it [pull the numbers] every single day, and I know from [Defendant Charlesworth's] explanation to me that it was extremely accurate." According to FE 2, Defendant Charlesworth had detailed sales data on his phone, and he monitored the Company's performance "every single day."

98. FE 3 and FE 6 stated that Defendant Charlesworth was shown Amy Hine's comprehensive analysis of the McDonald's expansion, including costs, and knew that Ms. Hine "asked the question many, many times: are you sure you want to proceed if it's going to cost this much money up front?" According to FE 6, Ms. Hine had regular meetings with Defendant Charlesworth about approval for the expansion expenses.

99. Given the Officer Defendants' duty to keep the Board informed, the Officer Defendants must have informed and updated the Board on the progress of the nationwide expansion. The failure to prevent the false and misleading statements described above demonstrate the Board's complicity in the misconduct.

**I. Officer and Director Exits**

100. The failure of the partnership with McDonald's led to the exit of officers and directors. On April 23, 2025, the Company announced that it was nominating a "[r]efreshed [s]late of [d]irectors to [s]upport [the] Company's [t]ransformation." In making the announcement, the Company told investors that the "refreshed Board" will focus on "profitable U.S. expansion."

101. On June 27, 2025, three days after announcing the end of its partnership with McDonald's, the Company announced the resignations of Defendant Ashukian and Chief Growth Officer David Skena.

**J. Defendants' Misconduct Has and Continues to Harm the Company**

102. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, damage to Krispy Kreme's reputation and goodwill, as well as the costs already incurred and to be incurred defending the Company in the Securities Class Action.

103. The Securities Class Action was filed against Krispy Kreme and Defendants Charlesworth and Ashukian on May 16, 2025. The plaintiffs in the Securities Class Action alleged that the Company and Defendants Charlesworth and Ashukian made false and misleading statements about the ability of the Company to successfully expand the McDonald's partnership nationwide and the costs of the expansion. The defendants in that action moved to dismiss the complaint for failure to state a claim.

104. The Court denied the motion to dismiss on August 26, 2026. In its order, the Court found that the plaintiffs had sufficiently pleaded that statements about Krispy Kreme's ability to execute the McDonald's partnership using existing capacity were false or misleading due to significant deficiencies in the Company's production and distribution capabilities that the defendants were or should have been aware of. According to the Court: "these statements cut directly to the heart of the McDonald's partnership's value proposition: Krispy Kreme could get more product in front of customers using only existing production and distribution infrastructure, thereby increasing profits without significantly increasing costs. By making these statements, Defendants misled investors about a material aspect of the partnership."

105. The Court also found that the plaintiffs had sufficiently pleaded that statements downplaying the significant upfront costs required by the partnership were false or misleading. Specifically, the Court noted that acknowledging some expected capital expenses did not "negate the failure to disclose the full scope of these costs and their direct connection to the McDonald's partnership." This was especially true because Ms. Hine's analysis about the costs of implementing the expansion "reache[d] conclusions at odds with those presented to the investing public."

106. The Court found that plaintiffs also had sufficiently pleaded that statements made in February 2025 about the success of the expansion were false and misleading because at that time, the defendants were already aware of untenable costs associated with the expansion, as well as the production and logistical deficiencies that existed. As stated by the Court:

> By February 2025, the McDonald's rollout had been underway for nearly five months and Plaintiffs' CWs allege that Defendants were aware of extensive complaints about product quality and data showing poor sales. See (Doc. No. 65 at 39, 69, 81). After nearly five months of the partnership, a reasonable investor would understand Defendants' claims that Krispy Kreme was still on track to reach 6,000 McDonald's by the end of the year as informed by internal data and specific enough that an investor could rely on them. Viewing the facts in the light most favorable to Plaintiffs and granting them all reasonable inferences fairly deducible therefrom,

> by February 2025 Defendants knew that the lofty plans they had for the partnership would not come to fruition, yet they continued to represent to investors that the partnership was on track and expected to meet its goals. As such, the Court finds that the foregoing statements are not mere corporate puffery and denies Defendants' motion to dismiss as it relates to the foregoing statements.

107. Finally, the Court found that plaintiffs had sufficiently pleaded scienter. First, the Court found that the plaintiffs had pleaded facts that support the inference that "Defendants agreed to a fundamentally flawed contract, knew early on that it was destined for failure, and continued to make public statements touting the partnership as a success to save face and their jobs." The plaintiffs had also sufficiently pleaded facts that suggested that the defendants were aware of or recklessly disregarded information about "operational deficiencies, the vast capital expenditures required to execute the McDonald's partnership, and the success (or lack thereof) of the rollout by February 2025."

### K. Krispy Kreme Issues False and Misleading Proxy Statements

108. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statements issued on April 24, 2024 (the "2024 Proxy") and April 28, 2025 (the "2025 Proxy"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

109. The Director Defendants drafted, approved, reviewed, and/or signed the 2024 Proxy and 2025 Proxy before they were filed with the SEC and disseminated to Krispy Kreme's stockholders. The Director Defendants negligently issued materially misleading statements in the 2024 Proxy and the 2025 Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any

allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the 2024 Proxy and the 2025 Proxy allegations and related claims.

110. In support of re-electing themselves, Defendants Charlesworth, Goudet, Andrada, Bell, Capel, Deno, Michaels, Pleuhs, Roberts, Telfer, and Weese highlighted their supposed oversight of the Company in the 2024 Proxy. The 2024 Proxy stated:

> **The Board's Oversight Responsibilities**
>
> The Company's corporate governance practices and policies ensure substantial independent oversight of management. For instance:
>
> - The Board has a majority of independent and non-employee directors. Six of the 11 director nominees are independent under Nasdaq's listing rules, and 10 of the 11 director nominees are non-employee directors. All of the Company's directors are elected annually.
> - The Board's Audit Committee and Remuneration Committee are composed solely of independent directors. Each of the Audit Committee and the Remuneration Committee is composed solely of independent directors. The committees provide independent oversight of management.
> - The Board's non-employee directors and independent directors meet regularly in executive session. The non-employee directors meet regularly in executive session without management present and, consistent with Nasdaq listing rules, the independent directors also meet regularly in executive session. These sessions are chaired by the Lead Director.
> - The Board reviews and approves the Annual Operating Plan. Management presents the Company's strategy and analysis for the year ahead in alignment with long-term goals and objectives.
>
> *Board Oversight of Risk*
>
> The Board's role in the Company's risk oversight process includes reviewing and discussing with management key areas of material risk to the Company. Annually, the Board reviews and provides input on the Company's enterprise risk management assessment. The Board primarily oversees matters related to strategic, operational, financial, and legal risks. The Audit Committee oversees matters of financial, legal, and compliance risk, including cybersecurity matters. The Remuneration Committee addresses risks related to compensation and other talent-related matters, as well as risks associated with Board independence and governance. Committees report to the full Board regarding their respective considerations and actions.

> *Board Oversight of Responsibility*
>
> KKI uses an integrated governance structure to oversee, develop, and execute the Company's Responsibility strategy to act responsibly and be a force for positive impact. The full Board is responsible for oversight, input, and guidance on long-term goals and commitments. The Company's executive leaders help guide and develop these corporate responsibility programs and provide regular updates, at least twice annually, to the Board on progress toward our goals. The Be Sweet Working Group, which includes executive leaders, has direct responsibility for driving the strategy, operational development, and execution of Responsibility initiatives. In 2023, the Company hired three key roles to build our Responsibility engine: Global Sustainability Lead, Global Belonging, Diversity, Equity, Inclusion and Accessibility Lead, and a VP, Global Corporate Communications & Partnership Engagement. Focus areas for the Company in 2023 included, among other things, diversity and inclusion, equity and access, food waste reduction, community engagement, responsible sourcing, sustainable packaging, energy use, and GHG emissions.
>
> We are committed to transparency and information sharing in corporate responsibility and other Responsibility topics that impact our Company. We have published the Company's first report on Responsibility initiatives in late fiscal year 2023.

111. In support of re-electing themselves, Defendants Charlesworth, Andrada, Capel, Deno, Grismer, Hees, Pleuhs, and Sundaram highlighted their supposed oversight of the Company in the 2025 Proxy. The 2025 Proxy stated:

> **The Board's Oversight Responsibilities**
>
> The Company maintains corporate governance practices and policies designed to facilitate effective oversight by the Board. The Company's Corporate Governance Principles provide that the Board's basic responsibility is to exercise its business judgment to act in what the Board reasonably believes to be the best interests of the Company and its stockholders. The Board selects, advises, and monitors the performance of senior management, which is responsible for operating the Company's business. As part of its oversight function, the Board reviews and approves the Company's annual operating plan and strategy for the year ahead in alignment with long-term goals and objectives.
>
> *Board Oversight of Risk*
>
> The Board is responsible for overseeing the Company's processes for assessing and managing risk. The Board's role in the Company's risk oversight process includes

> reviewing and discussing with management key areas of material risk to the Company. To administer its risk oversight function, the Board has delegated certain oversight responsibilities to its committees. The Board primarily oversees matters related to legal, compliance, strategic, operational, and financial risks. The Audit and Finance Committee oversees the Company's risk management in light of the Company's business strategy, capital strength, and overall risk tolerance, and oversees cybersecurity risks. The Remuneration and Nomination Committee oversees risks related to remuneration plans, policies, and practices applicable to officers and employees and other talent-related matters, as well as risks associated with Board independence and governance. Committees report to the full Board regarding their respective considerations, actions, and recommendations, as applicable.
>
> *Board Oversight of Responsibility*
>
> The Board oversees the Company's Responsibility strategy, including providing input and guidance on long-term goals and commitments. The Company's executive leaders and our Senior Director, Global Responsibility provide regular updates to the Board on progress toward the Company's Responsibility initiatives. The Company maintains a Be Sweet Advisory Committee, which is comprised of cross-functional leaders, to develop and execute the Company's Responsibility initiatives.

112. The 2024 Proxy and the 2025 Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the Company's operational deficiencies, the cost to execute the partnership with McDonald's, and the success of the expansion.

113. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**L. The Board Breached its Fiduciary Duties**

114. As officers and/or directors of Krispy Kreme, the Defendants owed Krispy Kreme fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Krispy Kreme in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Krispy Kreme, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

115. Defendants, because of their positions of control and authority as directors and/or officers of Krispy Kreme, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Krispy Kreme's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

116. To discharge their duties, the officers and directors of Krispy Kreme were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Krispy Kreme were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b) Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d) Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g) Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

117. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

118. The Board's Audit and Finance Committee is tasked with overseeing Krispy Kreme's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Krispy Kreme's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to its charter, the Audit and Finance Committee's responsibilities include:

- **Earnings Releases**. Review and discuss earnings to be issued in the Company's press releases, and periodically review the Company's corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

- **Disclosure Controls and Procedures**. Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures to ensure that policies are in place to ensure the accuracy of required and voluntary disclosures.

- **Ethical Environment**. Consult with management on the establishment and maintenance of an environment that promotes ethical behavior, including the establishment, communication, and enforcement of policies or codes of conduct to guard against dishonest, unethical, or illegal activities.

119. In violation of the Audit and Finance Committee Charter, and their general duties as members of the Audit and Finance Committee, Defendants Deno, Grismer, Michaels, Pleuhs, and Telfer conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit and Finance

Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

120. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

121. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Krispy Kreme.

## **DERIVATIVE ALLEGATIONS**

122. Plaintiff brings this action derivatively in the right and for the benefit of Krispy Kreme to redress injuries suffered by Krispy Kreme as a direct result of the Director Defendants' breaches of fiduciary duty. Krispy Kreme is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123. Plaintiff will adequately and fairly represent the interests of Krispy Kreme in enforcing and prosecuting the Company's rights.

124. Plaintiff was a stockholder of Krispy Kreme at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Krispy Kreme stockholder.

## DEMAND FUTILITY ALLEGATIONS

125. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

126. The Krispy Kreme Board currently has eight members: Defendants Charlesworth, Capel, Deno, Grismer, Hees, and Sundaram, as well as David Shear and Melissa Werneck.

127. Plaintiff has not made any demand on Krispy Kreme's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

128. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

129. The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Krispy Kreme. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were

sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

**A. Demand is Excused as to Defendant Charlesworth**

130. Defendant Charlesworth is the Company's CEO. Defendant Charlesworth received compensation of $3.69 million in 2025. Defendant Charlesworth depends on Krispy Kreme for his income. In addition, Krispy Kreme stated in the Schedule 14A Proxy Statement filed with the SEC on April 27, 2026 (the "2026 Proxy") that Defendant Charlesworth is not independent pursuant to Nasdaq requirements.

131. Defendant Charlesworth served as a director of the Company during the Relevant Time Period. As a director, Defendant Charlesworth had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Charlesworth was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

132. Defendant Charlesworth failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Krispy Kreme's controls, Defendant Charlesworth failed to protect corporate assets.

133. Defendant Charlesworth was an active participant in the misconduct described above. Defendant Charlesworth signed the 2025 10-K, as well as the Forms 10-Q filed by the Company during the Relevant Time Period. Defendant Charlesworth made false and misleading statements concerning the viability of the partnership with McDonald's and the partnership's actual performance. Defendant Charlesworth therefore faces a substantial likelihood of liability.

134. In addition, Defendant Charlesworth is a named defendant in the Securities Class Action.

135. Thus, Defendant Charlesworth faces a substantial likelihood of liability.

**B. Demand is Excused as to Defendant Capel**

136. Defendant Capel served as a director of the Company during the Relevant Time Period. As a director, Defendant Capel had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Capel was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

137. Defendant Capel failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Krispy Kreme's controls, Defendant Capel failed to protect corporate assets.

138. According to the 2026 Proxy, Defendant Capel received $363,231 in compensation in connection with her role as a Company director. Accordingly, Defendant Capel cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

139. Defendant Capel was an active participant in the misconduct described above. Defendant Capel signed the 2025 10-K. Defendant Capel therefore faces a substantial likelihood of liability.

140. Defendant Capel knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Capel breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Capel faces a substantial likelihood of liability for these breaches, making any demand on Defendant Capel futile.

141. In addition, Defendant Capel is a Senior Partner and Global Head of Human Capital at JAB Holding Company ("JAB"), where she has been employed since 2021. Since April 2025 Defendant Hees has been a Senior Advisor to JAB "with respect to its investments in the Company." Both Mr. Shear and Ms. Werneck had business relationships with individuals affiliated with JAB, although the Board decided that those relationships did not "impair the independence of such directors." According to the 2026 Proxy, Defendant Capel was determined not to be independent according to Nasdaq listing requirements. These relationships, and the Board's own determination, demonstrate that Defendant Capel is not independent.

**C. Demand is Excused as to Defendant Deno**

142. Defendant Deno served as a director of the Company during the Relevant Time Period. As a director, Defendant Deno had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Deno was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

143. Defendant Deno failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Krispy Kreme's controls, Defendant Deno failed to protect corporate assets.

144. According to the 2026 Proxy, Defendant Deno received $213,271 in compensation in connection with his role as a Company director. Defendant Deno is not otherwise employed. Accordingly, Defendant Deno cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

145. Defendant Deno was an active participant in the misconduct described above. Defendant Deno signed the 2025 10-K. Defendant Deno therefore faces a substantial likelihood of liability.

146. Defendant Deno served on the Audit and Finance Committee during the Relevant Time Period. The Audit and Finance Committee is responsible for reviewing earnings releases, overseeing disclosure controls and procedures, and consulting with management on the Company's ethical environment. The Audit and Finance Committee also was responsible for reviewing and approving Krispy Kreme's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Deno was thus responsible for knowingly or recklessly allowing the improper statements related to the viability of the partnership with McDonald's and the partnership's actual performance.

147. Defendant Deno knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Deno breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Deno faces a substantial likelihood of liability for these breaches, making any demand on Defendant Deno futile.

148. Defendant Deno served as Chief Financial Officer of Yum! Brands, Inc., prior to its spin-off, as well as Chief Operating Officer. Defendant Grismer also served as an executive at Yum! Brands, Inc. for almost 14 years, with his final position serving as Chief Financial Officer from 2012 to 2016. The prior working relationships of Defendants Grismer and Deno demonstrate that Defendant Deno is not independent.

**D. Demand is Excused as to Defendant Grismer**

149. Defendant Grismer served as a director of the Company during the Relevant Time Period. As a director, Defendant Grismer had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Grismer was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

150. Defendant Grismer failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Krispy Kreme's controls, Defendant Grismer failed to protect corporate assets.

151. According to the 2026 Proxy, Defendant Grismer received $170,373 in compensation in connection with his role as a Company director. Defendant Grismer is not otherwise employed. Accordingly, Defendant Grismer cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

152. Defendant Grismer served on the Audit and Finance Committee during the Relevant Time Period. The Audit and Finance Committee is responsible for reviewing earnings releases, overseeing disclosure controls and procedures, and consulting with management on the

Company's ethical environment. The Audit and Finance Committee also was responsible for reviewing and approving Krispy Kreme's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Grismer was thus responsible for knowingly or recklessly allowing the improper statements related to the viability of the partnership with McDonald's and the partnership's actual performance.

153. Defendant Grismer knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Grismer breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Grismer faces a substantial likelihood of liability for these breaches, making any demand on Defendant Grismer futile.

154. Defendant Grismer served as an executive at Yum! Brands, Inc. for almost 14 years, with his final position serving as Chief Financial Officer from 2012 to 2016. Defendant Deno also served as Chief Financial Officer of Yum! Brands, Inc., prior to its spin-off, as well as Chief Operating Officer. The prior working relationships of Defendants Grismer and Deno demonstrate that Defendant Grismer is not independent.

**E. Demand is Excused as to Defendant Hees**

155. Defendant Hees served as a director of the Company during the Relevant Time Period. As a director, Defendant Hees had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Hees was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

156. Defendant Hees failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By

consciously disregarding the duty to monitor Krispy Kreme's controls, Defendant Hees failed to protect corporate assets.

157. According to the 2026 Proxy, Defendant Hees received $322,695 in compensation in connection with his role as a Company director. Accordingly, Defendant Hees cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

158. Defendant Hees knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Hees breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Hees faces a substantial likelihood of liability for these breaches, making any demand on Defendant Hees futile.

159. In addition, since April 2025 Defendant Hees has been a Senior Advisor to JAB "with respect to its investments in the Company." Defendant Capel is a Senior Partner and Global Head of Human Capital at JAB, where she has been employed since 2021. Both Mr. Shear and Ms. Werneck had business relationships with individuals affiliated with JAB, including Defendant Hees, although the Board decided that those relationships did not "impair the independence of such directors." According to the 2026 Proxy, Defendant Hees was determined not to be independent according to Nasdaq listing requirements. These relationships, and the Board's own determination, demonstrate that Defendant Hees is not independent.

**F. Demand is Excused as to Defendant Sundaram**

160. Defendant Sundaram served as a director of the Company during the Relevant Time Period. As a director, Defendant Sundaram had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Sundaram was also

required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

161. Defendant Sundaram failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Krispy Kreme's controls, Defendant Sundaram failed to protect corporate assets.

162. According to the 2026 Proxy, Defendant Sundaram received $167,694 in compensation in connection with his role as a Company director. Accordingly, Defendant Sundaram cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

163. Defendant Sundaram served on the Audit and Finance Committee during the Relevant Time Period. The Audit and Finance Committee is responsible for reviewing earnings releases, overseeing disclosure controls and procedures, and consulting with management on the Company's ethical environment. The Audit and Finance Committee also was responsible for reviewing and approving Krispy Kreme's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Sundaram was thus responsible for knowingly or recklessly allowing the improper statements related to the viability of the partnership with McDonald's and the partnership's actual performance.

164. Defendant Sundaram knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Sundaram breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Sundaram faces a substantial likelihood of liability for these breaches, making any demand on Defendant Sundaram futile.

**G. Demand is Excused as to David Shear**

165. Mr. Shear served as the President, International of Restaurant Brands International Inc. ("RBI") from 2021 to 2024, after which he served as an Advisor to RBI until March 2025. RBI was formed in 2014 by the merger of Burger King and Tim Horton, and Mr. Shear was employed at Burger King since 2011. Defendant Hees served as CEO of Burger King Worldwide, Inc. and its predecessor from 2010 to 2013, while Mr. Shear was employed by Burger King.

166. In addition, Mr. Shear has had business relationships with individuals affiliated with JAB, including Defendant Hees. The Board has determined that Defendant Hees is not independent according to Nasdaq listing requirements. Although the Board decided that those relationships did not "impair the independence of such directors," Defendant Hees' lack of independence and Mr. Shear's relationship with Defendant Hees demonstrate that Mr. Shear is not independent.

**H. Demand is Excused as to Melissa Werneck**

167. Ms. Werneck was employed by Kraft Heinz from 2013 until 2026. She served as an an Executive Advisor from August 2025 to April 2026, and as Executive Vice President and Global Chief People Officer prior to that. She currently serves as a consultant to the executive leadership team at Kraft Heinz. Defendant Hees served as CEO of Kraft Heinz from 2015 to 2019, while Ms. Werneck was employed and in an executive position at that company.

168. In addition, Ms. Werneck has had business relationships with individuals affiliated with JAB, including Defendant Hees. The Board has determined that Defendant Hees is not independent according to Nasdaq listing requirements. Although the Board decided that those relationships did not "impair the independence of such directors," Defendant Hees' lack of

independence and Ms. Werneck's relationship with Defendant Hees demonstrate that Ms. Werneck is not independent.

169. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

170. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

171. Each of the Director Defendants owed and owes Krispy Kreme the highest obligations of loyalty, good faith, due care, and oversight.

172. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

173. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

174. In addition, the Director Defendants further breached their fiduciary duties owed to Krispy Kreme by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose serious issues impacting the viability of the partnership with McDonald's and the partnership's actual

performance. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

175. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

176. As a direct and proximate result of the breaches of duty alleged herein, Krispy Kreme has sustained and will sustain significant damages.

177. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

178. Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

## **COUNT II**

### **Breach of Fiduciary Duty**
### **(Derivatively Against the Officer Defendants)**

179. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

180. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Krispy Kreme the highest obligations of loyalty, good faith, due care, oversight, and candor.

181. The Officer Defendants breached their fiduciary duties owed to Krispy Kreme by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose serious issues impacting the viability of the partnership with McDonald's and the partnership's actual performance. The Officer Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

182. As a direct and proximate result of the breaches of duty alleged herein, Krispy Kreme has sustained and will sustain significant damages.

183. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

184. Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

## COUNT III

## Gross Mismanagement
## (Against All Defendants)

185. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

186. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

187. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

188. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Krispy Kreme has sustained and will sustain significant damages.

189. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

190. Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

**COUNT IV**

**Waste of Corporate Assets**
**(Derivatively Against All Defendants)**

191. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

192. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

193. As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

194. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Krispy Kreme has sustained significant damages.

195. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

196. Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

**COUNT V**

**Unjust Enrichment**
**(Derivatively Against the Officer Defendants)**

197. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

198. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

199. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

200. Plaintiff, on behalf of Krispy Kreme, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

**COUNT VI**

**Violation of Section 14(a) of the Exchange Act**
**(Against The Director Defendants)**

201. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

202. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of reliance upon any

allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

203. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2024 Proxy and 2025 Proxy. In the 2024 Proxy and 2025 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

204. The 2024 Proxy and 2025 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Krispy Kreme misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

205. Plaintiff, on behalf of Krispy Kreme, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2024 Proxy and 2025 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Krispy Kreme and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of Krispy Kreme for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of

fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding Krispy Kreme restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: October 30, 2026

**LONG LAW, LLC**

By: */s/ Brian D. Long*
Brian D. Long (#4347)
3828 Kennett Pike, Suite 208
Wilmington, Delaware 19807
Telephone: (302) 729-9100 Email:
bdlong@longlawde.com

*Attorneys for Plaintiff*

OF COUNSEL:

**MURRAY LAW PLLC**
Brian Murray
750 E. Main Street, Suite 620
Stamford, CT06902
Telephone: (203) 883-2170
Email: bmurray@brianmurraylaw.com

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl 50
Main Street, Suite 1000
White Plains, New York 10606
Telephone: (914) 400-1920
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com